**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

**CRIMINAL ACTION NO. 4:19-CR-00026-JHM-1**

**UNITED STATES OF AMERICA**                                                              **PLAINTIFF**

**V.**

**STEVE TURNER**                                                                              **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Steve Turner's Motion for a *Franks* Hearing

and to Suppress Evidence.  [DN 23].  Fully briefed, this matter is ripe for decision.  For the

following reasons, Defendant's motion is **DENIED**.

**I. BACKGROUND**

In May 2016, the Tennessee Valley Authority's ("TVA") Office of Inspector General

("OIG") began investigating Steve Turner for willful destruction of an energy facility.  [DN 23-10

at 6, ¶ 19].  Turner owned Corrosion Monitoring Services ("CMS"), a company that had conducted

regular corrosion inspections at TVA's Paradise power plant for several years.  [DN 23-3 at 4,

¶ 12].  The OIG believed that during one of the inspections, in September 2015, Turner

intentionally damaged hundreds of steel tubes with a fireman's axe.  [DN 23-10 at 6, ¶ 19].

After months of investigation, the OIG applied for a search warrant of CMS's headquarters

in St. Charles, Illinois. OIG Special Agent Samantha McIsaac ("Agent McIsaac") submitted a

sixteen-page affidavit in support of the search warrant application.  [DN 23-10].  The affidavit

explained the agency's on-site investigative efforts, interviews with Turner and former CMS

employees, and specifics of the steel tube damage.  [*Id*. at 6–12].  The affidavit concluded there

was probable cause that Turner had committed the offenses of destruction of government property,

1

18 U.S.C. § 1366, and false statements to a federal official, 18 U.S.C. § 1001, and that evidence

of the crimes was likely at CMS's headquarters. [DN 23-10 at 2–3]. Based on Agent McIsaac's

affidavit, a United States Magistrate Judge for the Northern District of Illinois approved the search

warrant on November 1, 2016. [*Id*. at 16]. The OIG conducted the search soon after.

Three years later, the Government indicted Turner on seven counts of felony wire fraud,

conspiracy to damage power facilities, and obstruction of justice.[1] [DN 1]. The Indictment alleged

that during Turner's September 2015 inspection of the Paradise power plant's air heater systems,

he willfully damaged hundreds of steel tubes with a fireman's axe and attempted to charge TVA

to fix them. [*Id*. at 1–3, ¶¶ 1–6]. Turner maintains the fireman's axe was part of a legitimate

inspection technique. [DN 23-3 at 3, ¶ 9].

Turner now moves to suppress evidence obtained during the search of CMS's headquarters.

[DN 23]. He claims Agent McIsaac's affidavit contained several false statements and material

omissions that, if corrected, would have prevented the Magistrate Judge from finding probable

cause for the search warrant. [DN 23-1]. Thus, Turner requests a hearing under *Franks v.

Delaware*, 438 U.S. 154 (1978), so the Court can consider the alleged misstatements and

omissions.

## II. LEGAL STANDARD

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation." U.S. CONST. amend. IV. "When probable cause is required, it

is an obvious assumption that there will be a truthful showing of probable cause." *United States

v. Witherspoon*, No. 1:09-cr-41, 2010 WL 724663, at *2 (W.D. Ky. Feb. 25, 2010) (citing *Franks*

---

[1] Earlier in this case, the Court dismissed one of the obstruction of justice charges for failure to state an offense. [DN 46]; *United States v. Turner*, No. 4:19-cr-26, 2020 WL 7389739 (W.D. Ky. Dec. 16, 2020). There are six remaining counts in the Indictment.

*v. Delaware*, 438 U.S. 154 (1978)).  Therefore, if the government only obtained probable cause

for a search warrant because of an affiant's false statements in the warrant application, the evidence

obtained through the warrant must be suppressed.  *Franks*, 438 U.S. at 156.  A defendant can

challenge the veracity of the affiant's statements through the process laid out in *Franks v.*

*Delaware*, 438 U.S. 154 (1978).

There are two steps in a *Franks* challenge.  In the first step, the defendant must make "a

substantial preliminary showing that [1] a false statement knowingly and intentionally, or with

reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . [2] the

allegedly false statement [was] necessary to the finding of probable cause."  *Id.* at 155–56.  "If the

defendant alleges an affiant's 'recklessness,' the court employs a subjective test."  *United States*

*v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019).  The defendant alleging recklessness must show

"the affiant subjectively 'entertained serious doubts as to the truth of his or her allegations."  *Id.*

(quoting *United States v. Cican*, 63 F. App'x 832, 836 (6th Cir. 2003)) (cleaned up).

If the defendant makes that initial showing, the district court must hold a hearing to

determine the veracity of the affiant's statements.  *Franks*, 438 U.S. at 156.  At the hearing, the

defendant must prove by a preponderance of the evidence that "a false statement knowingly and

intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant

affidavit."  *Id.* at 155–56.  "If this is established by the defendant, then the false material must be

set aside in determining whether the remaining content is sufficient to establish probable cause."

*Witherspoon*, 2010 WL 724663, at *2 (citing *Franks*, 438 U.S. at 156).  If the remaining material

fails to establish probable cause, "the search warrant must be voided and the fruits of the search

excluded to the same extent as if probable cause was lacking on the face of the affidavit."  *Franks*,

438 U.S. at 156.  This hearing is commonly referred to as a *Franks* hearing.  *See, e.g.*, *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001).

### III. DISCUSSION

At the outset, the Court reiterates that the key question in the *Franks* inquiry is whether *Agent McIsaac* knowingly or recklessly lied in the affidavit.  "It is not enough . . . to show that the affidavit contains false information; in order to obtain a *Franks* hearing, defendant[ ] must make a 'substantial preliminary showing' that the false statements *originated with the government affiant*, not with the informants . . . ."  *United States v. Giacalone*, 853 F.2d 470, 475–76 (6th Cir. 1988) (emphasis added); *see also United States v. Faller*, No. 1:13-cr-29-JHM, 2015 WL 1977583, at *3 (W.D. Ky. Apr. 30, 2015) ("[T]he key inquiry for *Franks* is whether the *affiant* intentionally or recklessly included a false statement, not the [informant].").  If Turner intends to challenge the truth of the witnesses' statements, cross-examination at trial, not a *Franks* hearing, is the proper mechanism.

Turner argues that a *Franks* hearing is warranted because at least seven parts of Agent McIsaac's search warrant affidavit contained materially false statements or omissions.  Turner also alleges that Agent McIsaac's use of unnamed informants did not give the Magistrate Judge adequate grounds for concluding that there was probable cause for the search.  The Court will consider Turner's arguments in three parts: (1) false statements in the affidavit, (2) exculpatory information that was omitted from the affidavit, and (3) the affidavit's reliance on unnamed individuals to establish probable cause.

#### A. *Franks* Hearing: False Statements

Turner first challenges several affirmative statements in Agent McIsaac's affidavit.  To obtain a *Franks* hearing based on statements that appeared in an affidavit, Turner must first make

"a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement . . . in the affidavit." *Bateman*, 945 F.3d at 1008. Second, Turner must show "the false statement . . . [was] necessary to the probable cause finding in the affidavit." *Id.* (quoting *United States v. Young*, 847 F.3d 328, 348–49 (6th Cir. 2017)).

### i.    False Statement About CMS's Financial Difficulties

The first allegedly false statement that Turner identifies involves CMS's finances.  The affidavit states that

> [Former CMS Chief Financial Officer Bruce] Brazas reported that, in 2015, CMS began having financial difficulties and within the first five months (approximately) of that calendar year CMS had lost approximately $800,000 in net profits.

[DN 23-10 at 10, ¶ 36].

When a defendant challenges an affiant's statement that was originally made by a third party, there are two potential types of *Franks* challenges: (1) claiming the third party never made the statement (i.e., the affiant made it all up), and (2) admitting the third party made the statement, but challenging the underlying truth of the third party's statement (i.e., the third party lied to the affiant).  *See Giacalone*, 853 F.2d at 476.  If the defendant takes the second route (contesting the underlying truth of the third party's statements), he bears a heavy burden.  Even if the third party lied to the affiant, the defendant has no recourse unless the affiant "repeated the stories of the [third party] with reckless indifference to the truth." *Id.*

Here, Turner takes the second route—he challenges the truth of Brazas's statement to Agent McIsaac. [DN 23-1 at 18–20].  This challenge fails the first step of *Franks* because Turner never alleges Agent McIsaac repeated Brazas's story "with reckless indifference to the truth." *See*

*id*. Turner provides no reason why Agent McIsaac should not have believed Brazas.[2]  Brazas was

CMS's former Chief Financial Officer, and a Chief Financial Officer presumptively has significant

information about a company's finances.  *See generally In re Cardinal Health Inc. Sec. Litig.*,

426 F. Supp. 2d 688, 724 (S.D. Ohio 2006) ("Courts may presume that high-level executives are

aware of matters related to their business' operation where the misrepresentations or omissions

pertain to central, day-to-day operational matters.").  Turner provides no evidence suggesting any

special circumstances caused Agent McIsaac to doubt Brazas's veracity.  The affiant admits CMS

fired Brazas before he cooperated, [DN 23-10 at 9, ¶ 31 n.4], but Brazas's termination, standing

alone, does not provide reason to doubt the truth of his assertions.

Grasping at ways to prove Agent McIsaac's "reckless indifference" toward Brazas's

statements, Turner points out that Brazas gave conflicting deposition testimony about CMS's

finances in a civil case.  [DN 23-1 at 18].  According to Turner, this should have given Agent

McIsaac reason to believe Brazas's statements were not truthful.  But that deposition occurred in

December 2017, *thirteen months after* Agent McIsaac submitted the affidavit in this case.

[DN 23-12].  At the time Agent McIsaac submitted the affidavit, she had no reason to doubt the

truth of Brazas's statements.  *Hale v. Kart*, 396 F.3d 721, 728 n.6 (6th Cir. 2005) (the factual

inquiry, for purposes of a *Franks* challenge, is limited to the facts known to the officer when

submitting the affidavit).

Absent any showing that Agent McIsaac created the false statements herself or "repeated

the stories of the [informant] with reckless indifference to the truth," Turner's challenge to the

---

[2] The affidavit's use of hearsay poses no issue.  *Aguilar v. Texas*, 378 U.S. 108, 114 (1964), *abrogated on other grounds by Illinois v. Gates*, 462 U.S. 213 (1983) ("[A]n affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant . . . .").

affidavit's statements about CMS's financial condition does not raise a *Franks* question. *Giacalone*, 853 F.2d at 476.

### ii.      False Statement that Damage Caused an Accelerated Loss of Efficiency

The same lack of evidence regarding Agent McIsaac's intent or recklessness dooms Turner's second challenge, as well.  Turner claims the following statement in the affidavit is false:

> The damage [caused by Turner] resulted in an accelerated loss of efficiency of the unit and will require TVA to repair and/or replace the damaged parts to return the device to its intended operating purpose.

[DN 23-10 at 2, ¶ 5].  But it does not matter whether this statement is true or false, because Turner never alleges Agent McIsaac knew the statement was false or had reason to doubt the truth of the statement.  *See Franks*, 438 U.S. at 171 (to receive a *Franks* hearing, "[t]here must be allegations of deliberate falsehood or reckless disregard for the truth").  The only evidence of falsity that Turner produces is a report by "industry expert Lonnie Coffey," which found that small holes of the type Turner made have no adverse effect on system performance.  [*See* DN 23-6].  But the report is dated January 2017.  [*Id*.].  Agent McIsaac submitted the affidavit in November 2016.  [DN 23-10].  Turner therefore provides no pre-affidavit evidence that would provide reason to believe Agent McIsaac doubted the truth of her assertions when she submitted the affidavit.  *Hale*, 396 F.3d at 728 n.6.  For this reason, a *Franks* hearing is not warranted on this statement regardless of its truth.

### iii.      False Statement that Turner Did Not Take Photographs During Inspection

Next, Turner contests the following statement from the affidavit:

> Turner advised the TVA-OIG that, as a normal course of business while conducting inspections, he would take photographs during inspections to document his findings for the customer. However, during the September 2015 inspection where he conducted destructive testing in U3, Turner advised he did not take photographs because he did not think he needed to as the information was in his "memory" and because [TVA Paradise] was primarily concerned with air leakage tests . . . .

[DN 23-10 at 8, ¶ 28].  Turner blasts this statement as a "blatant misstatement."  [DN 23-1 at 23].

In support, he shares an email he sent to Agent McIsaac, on the night of the interview, stating

"[t]he photographs from the September 2015 inspection are stored on our office client files. I'd be

happy to share with you all these photos in their entirety."  [DN 23-4 at 1].  The Government

claims Agent McIsaac's statement was "entirely consistent" with Turner's statements in the

interview, regardless of what the email said.  [DN 35 at 13].

       In the first step of the initial *Franks* inquiry, Turner must make a "substantial preliminary

showing" that Agent McIsaac knowingly or recklessly (and falsely) stated Turner denied taking

photographs during the September 2015 inspection.  This first step considers two distinct

questions.  The first question is whether Turner made that statement in the interview.  If he did

not, then the second question is whether Agent McIsaac included the false statement in the affidavit

knowingly or recklessly.

       Addressing the first question (falsity) requires the Court to understand what Turner said in

the interview.  The OIG did not record the interview, so the Court must consider post-interview

documents to piece together what Turner said.  The parties entered two post-interview summaries

into evidence: (1) an email from Turner to Agent McIsaac, sent the night of the interview,

"summariz[ing]" the conversation [DN 23-4]; and (2) a post-interview memorandum written by a

OIG special agent.  [DN 35-1].  In Turner's post-interview email, he told Agent McIsaac that he

had pictures in his client files and was "happy" to send them to the OIG.  [DN 23-4 at 1].  This

statement suggests that Turner was, at most, noncommittal in the interview about whether he had

photographs from the September 2015 inspection.  The email does not suggest Turner outright

denied having photographs during the interview.

The OIG's post-interview memorandum appears to support Turner's interpretation of what he said in the interview. The only photograph-related statements in the OIG's memorandum said that "Turner . . . photographs areas of concern with the tubes," and "[Turner] does not include pictures of the puncture holes . . . ." [DN 35-1]. But saying Turner does not take photographs of the puncture holes is quite different from saying Turner did not take any photographs, period, of the September 2015 inspection. If Turner had told the OIG he did not take photographs during the September 2015 inspection, it would seem like the OIG would have naturally included it in one of those sentences. So, the OIG memorandum's silence suggests Turner's interpretation is correct— he never made the statement attributed to him by Agent McIsaac. Turner has made a preliminary showing that Agent McIsaac made a false statement when she recalled Turner's statement about photographs during the September 2015 inspection.

Addressing the second question—Turner has likely made a sufficient preliminary showing that Agent McIsaac made the false statement recklessly. Agent McIsaac's affidavit lays out a very detailed description of Turner's explanation why he took no pictures during the September 2015 inspection, complete with a quote from Turner that the information was in his "memory." [DN 23-10 at 8, ¶ 28]. But Agent McIsaac wrote the affidavit five months after the alleged statement. And the Government produces no notes or memoranda showing where Agent McIsaac retrieved such specific details five months after the fact. The OIG memorandum does not support it. And Turner's post-interview email suggests exactly the opposite. Agent McIsaac clearly considered those post-interview documents while drafting the affidavit—she specifically mentioned Turner's email. [DN 23-10 at 10, ¶ 34]. But the evidence before the Court suggests Agent McIsaac may have eschewed the contemporaneous documents in favor of her memory from five months earlier. Given the specificity of Agent McIsaac's statement (including a direct quote from Turner), reliance

on a five-month old memory contradicted by the contemporaneous evidence could exhibit reckless disregard for the truth. *See United States v. White*, No. 2:07-cr-4, 2007 WL 2404995, at \*12 (N.D. W. Va. Aug. 17, 2007) (granting a *Franks* hearing when a police report contradicted the same officer's affidavit in support of the search warrant).

But that is only the first step of the *Franks* inquiry. To receive a *Franks* hearing, Turner must also show Agent McIsaac's allegedly false statement was necessary to the Magistrate Judge's probable cause finding. *Bateman*, 945 F.3d at 1008. This Turner cannot do.[3] It appears Agent McIsaac included the information about Turner's lack of photographs in September 2015 as evidence that Turner committed the offense "willfully."[4] To commit an offense "willfully," a defendant typically must "knowingly and purposely intend[ ] to violate the law." *United States v. Sassak*, 881 F.2d 276, 280 (6th Cir. 1989).[5] Even with the potentially false statement removed from the affidavit, the affidavit includes considerable evidence from which the Magistrate Judge could infer a purposeful violation of the law: (a) Turner conducted destructive testing without the knowledge of TVA personnel, (b) Turner told a CMS employee he wanted to "expedite" damage, and (c) CMS did not teach destructive testing to employees. [DN 23-10 at 8–9, 11 ¶¶ 25, 30, 38]. This information gave the Magistrate Judge ample basis to determine that there was probable cause of a criminal violation, even without information about photographs of the inspection.

---

[3] Because Turner does not meet his initial burden of showing an intentional or reckless false statement for any other issues, the Court can consider this statement's effect on probable cause in isolation. *See McCallum v. Geelhood*, 742 F. App'x 985, 991 (6th Cir. 2018) (stating that the *Franks* inquiry "requires the court to 'set aside the false statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause.'" (quoting *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010))).

[4] The Magistrate Judge approved the search warrant for violation of 18 U.S.C. § 1366, which proscribes "knowingly and willfully damag[ing] . . . the property of an energy facility . . . ."

[5] For purposes of this motion, the Court assumes without deciding that the Magistrate Judge applied the ordinary definition of "willfully" when determining that there was probable cause.

### iv.    False Statement that Turner Acted Alone

Turner's fourth challenge also involves Turner's interview with the OIG.  In the affidavit, Agent McIsaac attested that "[Turner] stated that he (alone) climbed up a ladder and inserted a fireman's tool into the tubes . . . ."  [DN 23-10 at 8, ¶ 26].  Turner again claims Agent McIsaac invented this fact from Turner's interview.  But unlike the prior issue, this time Turner focuses less on the specifics of what he said in the interview and more on the underlying truth of the statement. He claims he did not actually conduct the inspection alone because he had a debilitating shoulder injury that limited his mobility.  [DN 23-1 at 24].  The Government returns the focus to the interview—it states that Turner never told the OIG agents about anyone else's involvement.  [DN 35 at 14].

Unlike the prior issue, the post-interview documents support the Government's argument. The OIG's post-interview memorandum stated: "Most of the time Turner inspects the system, he is alone.  During the February [2016] inspection, Turner was accompanied by one of his inspectors named Pat Hackle."  [DN 35-1 at 2].  Similarly, Turner's post-interview email to the OIG investigators claimed "In September of 2015, I inspected Unit #3 and . . . performed sampling testing using mechanical force to determine exactly how far the damage mechanism has [sic] spread . . . ."  [DN 23-4 at 1].  Neither of these post-interview memoranda mention anyone else's involvement, and both imply that Turner acted alone in the September 2015 inspection.

Even now, Turner does not definitively argue that he told Agent McIsaac about anyone else's involvement during the interview.  His affidavit in support of this motion states that "[I] did not advise Agent McIsaac that I alone used the axe."  [DN 23-3 at 7, ¶ 24].  This sentence is notable for what it lacks.  Specifically, it lacks any suggestion that Turner told Agent McIsaac about anyone else's involvement.  Given that Turner never mentioned anyone else's involvement, Agent

11

McIsaac could naturally draw the conclusion that Turner acted alone. Agent McIsaac did not make a false statement.

### B. *Franks* Hearing: Omissions

Turner also raises three *Franks* challenges based on apparent *omissions* from the search warrant affidavit.  He identifies three situations where Agent McIsaac allegedly knowingly or recklessly omitted exculpatory information from the search warrant affidavit.  Turner claims this material information, if included, would have prevented the Magistrate Judge from finding probable cause for the search warrant.

A "false statement," for purposes of the *Franks* inquiry, can include a material omission from a search warrant affidavit.  *United States v. Duval*, 742 F.3d 246, 251 (6th Cir. 2014) ("*Franks* also extends to circumstances in which an officer omits evidence in a search-warrant affidavit that is critical to determining the existence of probable cause.").  The Sixth Circuit, however, "has repeatedly held that there is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement."  *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008).  The higher bar is necessary because "an allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit."  *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001) (quoting *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997)).  "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."  *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998) (quoting *United States v. Colkley,* 899 F.2d 297, 302 (4th Cir. 1990)).  Therefore, a *Franks* hearing based on material omissions is warranted only in the "rare instances"

where the defendant makes the initial showing "that the affiant engaged in deliberate or reckless

disregard of the truth in omitting the information from the affidavit." *Graham*, 275 F.3d at 506.

None of the three alleged omissions from Agent McIsaac's affidavit meets the high

standard for a *Franks* hearing based on material omissions.

### i.   Omission of Whistleblower's Motives

First, Turner claims Agent McIsaac recklessly omitted information about the nefarious

motives of Brian Schifler, the former CMS employee who first informed the TVA of Turner's

alleged criminal activity.  [DN 23-1 at 17–18].  The relevant part of Agent McIsaac's affidavit

states

> Schifler voluntarily provided information to law enforcement because he believed
> Turner was illegally damaging a power plant. Schifler said he felt it was wrong.
> Schifler was terminated from CMS before providing the information.

[DN 23-10 at 9, ¶ 30 n.3].  Turner believes this obfuscates Schifler's motive.  CMS fired Schifler

after he began working for a competitor (in violation of his noncompete agreement) while on

disability leave at CMS.  [DN 23-3 at 6–7, ¶ 22].  Turner maintains that Schifler's motive was

generating business for his new employer and settling a grudge with Turner, information that does

not appear in the affidavit.  [DN 23-1 at 17].

Turner's argument misses the mark.  Agent McIsaac's affidavit clearly just recalls what

Schifler told her—he provided the information because "he felt it was wrong."  [DN 23-10 at 9,

¶ 30 n.3].  As with Brazas's allegedly false statement, Turner does not allege that Agent McIsaac

"repeated the stories of the [third party] with reckless indifference to the truth."  *United States v.*

*Giacalone*, 853 F.2d 470, 476 (6th Cir. 1988).  And even if she did doubt the truth of Schifler's

assertions, Agent McIsaac did not ask the Magistrate Judge to accept Schifler's words at face

value.  She stated that CMS fired Schifler before he provided information to the TVA, giving the

Magistrate Judge ample basis to draw her own conclusion about Schifler's motive. *See Atkin*, 107 F.3d at 1217 (no material omission when an affidavit provided enough factual information about informants that the reviewing judge could determine they "were persons whose veracity could be questioned"); *United States v. Fowler*, 535 F.3d 408, 416 (6th Cir. 2008) (finding an agent did not materially omit information regarding an informant's criminal activity when the affidavit factually acknowledged that the informant sold drugs to the agent).

### ii.    Omission of Preexisting Corrosion Information

Next, Turner argues the affidavit recklessly omitted information about preexisting corrosion damage to the air heaters. Specifically, Turner identifies a CMS-created inspection report, shared with the TVA, that showed the air heaters suffered corrosion damage years before Turner's alleged damage to the steel tubes. [DN 23-1 at 23–24]. This inspection report purportedly provides evidence that the significant cost to repair the air heaters was mostly because of preexisting corrosion, not damage caused by Turner.

This argument fails because the affidavit clearly distinguishes between preexisting corrosion and the intentional damage that Turner allegedly caused. The relevant section of Agent McIsaac's affidavit states the following:

> Prior to the damaged tubes being repaired, I personally inspected U3 and observed numerous air heater tubes which had a puncture mark on the inside of the tube, as well as a squared off edge at the bottom of the tube. According to [TVA] engineers, *the punctures were not a result of natural corrosion and/or erosion* and would have to be repaired and/or replaced to prevent further damage to U3. . . . Further, in order to prevent any further air leakage and corrosion of the Unit, the punctured tubes were temporarily repaired by a third party contractor. The cost of that repair was approximately $102,000. [TVA] is in the process of obtaining bids to replace the damaged tubes, which would permanently repair the damage caused by the punctures.

[DN 23-10 at 12, ¶ 44 (emphasis added)]. Agent McIsaac identified the "punctures" as intentional damage allegedly caused by Turner, and she focused only on the cost of those repairs. So, the fact

that there was also preexisting corrosion does not change the fact that intentionally punctured tubes

caused $102,000 in damage.

### iii.    Omission of TVA's Repair Policy

Third, and finally, Turner argues Agent McIsaac omitted important information about the

TVA's repair policy.[6]  [DN 23-1 at 25–26].  He claims that, had Agent McIsaac disclosed this

information, it would have diminished the argument that Turner financially benefitted from

damaging the steel tubes.  [*Id*.].

This argument also fails because Turner only alleges information does not appear in the

affidavit—he never alleges, let alone provides evidence, that Agent McIsaac deliberately or

recklessly omitted this information.  *See United States v. Carpenter*, 360 F.3d 591, 597 (6th Cir.

2004) (en banc) ("The [defendants] have made no showing that [the affiant] omitted facts from his

affidavit deliberately or recklessly.").  Without any evidence that Agent McIsaac knew about the

repair policy, Turner cannot receive a *Franks* hearing on this issue.  *See Graham*, 275 F.3d at 506

(a *Franks* hearing is warranted only if the defendant shows "that the affiant engaged in deliberate

or reckless disregard of the truth in omitting the information from the affidavit").

### C.  Probable Cause

Turner also lodges a challenge that does not fit within the *Franks* framework.  He

challenges Agent McIsaac's reliance on unnamed "industry professionals" and "experts" in her

affidavit. Turner maintains the Magistrate Judge did not have probable cause to authorize the

---

[6] According to Turner, the TVA will not authorize repairs unless fifteen percent of the tubes are out of service. [DN 23-1 at 25].  Turner asserts he would have had to damage 6,300 tubes to reach the fifteen percent threshold, so the alleged damage to 600 tubes would result in no financial benefit to CMS.  [*Id*.].

search warrant because there was not enough identifying information about these unnamed experts.

[DN 23-1 at 21–22, 25].  The first relevant part of the affidavit states:

> According to PAF engineers, industry professionals, and former CMS employees trained in the air heater inspection service, if enough tubes in an air heater have holes, then the hot flue gas/ambient air interchange increases within the metal casing. As a result, any undamaged tubes near the tubes with holes will start to corrode, deteriorate, and corrosion then spreads throughout the entire unit at an accelerated rate.

[DN 23-10 at 6–7, ¶ 21].  The second relevant part states:

> According to PAF engineers, industry professionals, former CMS employees trained in the air heater inspection service, and Turner (in an email he sent to the affiant subsequent to his interview), predicting future failure rates in air heater tubes is very difficult. An industry expert employed by a competitor of CMS – which is also a subcontractor of the company which manufactured PAF's U3 air heater – stated that predicting future equipment failure is a guess and his company will not do it unless specifically asked by the customer, which is rare. If they are asked, they conduct additional testing beyond what is normally done in routine inspections.

[DN 23-10 at 10, ¶ 34].

This is not a *Franks* challenge.  Turner does not allege Agent McIsaac lied about witness credibility or manufactured the witnesses' credentials.  *Cf. Franks*, 438 U.S. at 171.  Rather, Turner's challenge is a facial probable cause challenge—Turner alleges that, when considering the lack of identifying information for the witnesses, the Magistrate Judge did not have probable cause to authorize the search.  *See United States v. Woosley*, 361 F.3d 924, 925–26 (6th Cir. 2004) (delineating between probable cause challenges and *Franks* challenges).

"The magistrate's determination of probable cause is afforded great deference and should be reversed only if arbitrarily made."  *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006).  A reviewing court considers "whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited."  *Woosley*, 361 F.3d at 926 (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)).

16

When an affiant relies on information from confidential informants, courts often require independent corroboration or prior reliable information from the informant. *Id*. at 926–27. But the Sixth Circuit has admonished that probable cause is not a formulaic concept, and a court reviewing a magistrate judge's probable cause determination must not engage in "line-by-line scrutiny." *United States v. Allen*, 211 F.3d 900, 973 (6th Cir. 2000) (en banc) (quoting *Illinois v. Gates*, 462 U.S. 213, 245 n.14 (1983)).

Turner attempts to draw a comparison between cases involving confidential informants and the unnamed individuals in the affidavit. But as Turner acknowledges, case law surrounding confidential informants is distinct from the current situation, where the unnamed individuals merely provided nonincriminating information in an ongoing investigation. *See United States v. Mathis*, No. 2:07-cr-266, 2008 WL 1990443, at \*13–14 (S.D. Ohio May 2, 2008) (delineating between anonymous informants who provide information that *triggers* a criminal investigation and unnamed witnesses who provide relevant information in an *ongoing* investigation). Nonetheless, Turner asks the Court to graft confidential informant concepts onto all unnamed individuals in an affidavit—essentially, he suggests a standard where background information or corroboration is required for any information provided by an unnamed person in a search warrant affidavit.

The Court need not consider Turner's expansive argument. Because even if Turner's proposed standard does apply, Agent McIsaac's affidavit satisfies it. The affidavit corroborated the unnamed individuals' assertions with information *from Turner himself*. [DN 23-10 at 10, ¶ 34 ("According to PAF engineers, industry professionals, former CMS employees . . . , *and Turner* . . .") (emphasis added)]. This corroboration provides ample support for the unnamed individuals' assertions. *See Woosley*, 361 F.3d at 927 ("[A]n affidavit that supplies little

17

information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information.").

Further, the information provided by the unnamed individuals does not weigh heavily on probable cause. In the cases Turner cites, the confidential informant's tip was the sole evidence supporting the search warrant. *See United States v. Greene*, 250 F.3d 471, 475, 479–80 (6th Cir. 2001) (informant provided house address where police found illegal firearms); *United States v. Allen*, 211 F.3d 970, 971–72 (6th Cir. 2000) (informant tipped off officers about location where individual had drugs); *United States v. Finch*, 998 F.2d 349, 352 (6th Cir. 1993) (same). Here, by contrast, the affidavit cited the unnamed individuals for two relatively benign points about air heater tube performance. [DN 23-10 at 6–7, 10, ¶¶ 21, 34]. This information (1) provided no details of Turner's alleged criminal acts and (2) was not clearly related to the alleged crimes the search warrant was issued for: destruction of an energy facility and false statements to a federal official. 18 U.S.C. §§ 1366; 1001. It appears the affidavit included the information about the future air heater performance rate to insinuate that CMS's "newly created predictive financial savings model," which was discussed in the prior paragraph of the affidavit, was guesswork. [DN 23-10 at 10, ¶ 33]. But it entirely unclear how anything involving a financial savings model relates to "knowingly and willfully damag[ing] . . . the property of an energy facility" or making a false statement to the TVA OIG, the two potential crimes for which the Magistrate Judge issued the search warrant. 18 U.S.C. §§ 1366, 1001(a); [DN 23-10 at 16, ¶ 56]. This information had, at most, a minimal effect on the Magistrate Judge's probable cause determination.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant's Motion for a *Franks* Hearing and to Suppress Evidence [DN 23] is **DENIED**.

Joseph H. McKinley Jr., Senior Judge

United States District Court

February 8, 2021

cc:     Counsel of Record