UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) NO.   4:19-cr-00026-JHM |
| STEVE TURNER, | ) ) ) |
| Defendant. | ) ) |

## SENTENCING MEMORANDUM
## OF DEFENDANT STEVE TURNER

Defendant Steve Turner has always worked hard to provide for his friends, family, and community. He is a generous and caring man who often puts the needs of others before his own. Mr. Turner supplies this Sentencing Memorandum to assist the Court in imposing a sentence that is sufficient, but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). For the reasons discussed below, the Court should sentence Mr. Turner to probation, along with a fine. This sentence is appropriate upon consideration of the standard and sentencing factors set forth in 18 U.S.C. § 3553(a), including his good character, the nature and circumstances of the offense, and the significant toll this case has already taken on Mr. Turner and his business.

<u>Argument</u>

Mr. Turner has no objection to the way that the Sentencing Guidelines have been calculated in this case. Based upon a total offense level of 12 and a criminal history category of I, the guideline imprisonment range is 10 months to 16 months. As the guideline range is in Zone C, the minimum term may be satisfied by a sentence of imprisonment that includes a term of supervised

release with a condition that substitutes community confinement or home detention, provided that at least one-half of the minimum term is satisfied by imprisonment. U.S.S.G. §5C1.1(d).

As the Court knows, however, its discretion is no longer limited by the guidelines since its matrix is merely advisory. *United States v. Booker*, 543 U.S. 220, 245-67 (2005). Thus, the Guidelines are no longer "the only consideration" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Rather, the Guidelines merely provide a "starting point" for the Court's sentencing considerations. *Id.; accord Cunningham v. California*, 549 U.S. 270 (2007). Congress has identified four "purposes" of sentencing: punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(2). To achieve these ends, § 3553(a) requires that the Court consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors:

(1) the nature of the offense and history and characteristics of the defendant;
(2) the purpose of sentencing;
(3) the kinds of sentences available;
(4) the Sentencing Guidelines;
(5) pertinent policy statements issued by the Sentencing Commission;
(6) the need to avoid unwarranted disparities among similar offenders; and
(7) the need to provide restitution to victims.

18 U.S.C. § 3553(a). As discussed in more detail below, an examination of Mr. Turner's life and the circumstance of this offense demonstrates the need for a downward variance and a sentence of probation.

I. A SENTENCE OF PROBATION IS APPROPRIATE BASED ON THE PLEA AGREEMENT AND ON THE §3553(A) FACTORS.

The plea agreement provides that the government will argue for a split sentence— 6 months imprisonment followed by supervised release with a condition of 6 months home detention but allows Mr. Turner to argue for a variance and a sentence of probation. (R. 96, ¶ 11.) As explained herein, the Court should vary by one point and sentence Mr. Turner to a term of probation.

2

A. The Nature of the Offense and Mr. Turner's Personal History and Characteristics Support a Sentence of Probation.

Mr. Turner is 66 years old. He is married and has two children of his own—both adults now—and a number of grandchildren. Mr. Turner attended Illinois State University and received a bachelor's degree in biology from in 1977. After graduating, Mr. Turner went to work for his dad as an industrial radiographer at Superior Industrial X-ray, a company his dad owned. In 1982, Mr. Turner developed a probe to assist in inspecting heat exchangers in oil refineries and chemical plants. Mr. Turner continued to work with his dad until 1985 when he founded his own company, Corrosion Monitoring Services ("CMS").

At its heart, CMS is a boiler repair company, but that does not really tell the whole story. Mr. Turner was President of CMS for approximately 35 years. During his tenure, CMS grew from a small operation that literally operated out of a garage into a company that works globally and employs upwards of 60 people during their peak seasons. The "about us" section on the website does a better job of explaining exactly what it is that CMS does:

> At Corrosion Monitoring Services, we have significantly advanced the technology, understanding, and approach for the inspection and repair of essential equipment such as tubular air hearers, air ducts, heat exchangers, multi-cyclone dust collectors, evaporators, clinker coolers, and surface condensers. Corrosion Monitoring Services provides long-term operational solutions that protect the tubular air heater from erosion, corrosion, and fly ash fouling.

(*See* https://www.cmsinc.us/about.html). At the risk of grossly oversimplifying CMS' work, CMS inspects and repairs tubular air heaters, often at power facilities, so that those facilities can keep on working. While Mr. Turner still works at CMS, his son Alex is now its president.

In addition to being very good at what it does, CMS treats its employees like family. One employee, Steve Lennie, says that "Steve would give you the shirt off of his back," while another

employee, Ernesto Cabrera, says he actually witnessed Mr. Turner (who he endearingly calls "Uncle Stevie") give another employee the coat off of his own back. (Letter from Steve Lennie, attached as Exhibit A; Letter from Ernesto Cabrera, attached as Exhibit B). Another employee, Jose Murillo, says that he "look[s] up to Steve as a father" and explains that Steve gave him "opportunities that nobody else ever has, or wanted to." (Letter from Jose Murillo, attached as Exhibit C.) Mr. Murillo explains that he was sent to prison as a younger man and, when he got out, it was Steve Turner that gave him a second chance. He has turned his life around, purchasing a home, getting married and has a baby girl. "None of this would have been possible without Steve's generosity and kind heart, and giving nature." (*Id.*)

Mr. Turner's accountant and brother-in-law, Gerard Schrementi, writes about how two occasions where Mr. Turner cared for the families of employees who died tragically. In both circumstances, Mr. Turner continued to pay his employees' widows and provide them with health insurance well after their death.[1] (Letter from Gerard Schrementi, attached as Exhibit D). Another employee, Adam Hanes, writes about how he was unemployed and the father of an infant when he was hired by Steve Turner. He has now known Steve for over 24 years. On one occasion, after Adam had been away from home for work, Steve paid for Adam and his whole family to go to Disney world for a week as a "thank you." (Letter from Adam Hanes, attached as Exhibit E).

In addition to treating his employees like family, it is clear that Mr. Turner is a central pillar amongst his own blood relatives, too. Mr. Turner's nephew, Drew Thiessen, speaks to Mr. Turner's role in his family:

---

[1] Without diminishing the seriousness of the conduct charged in Count 2, Mr. Turner represents to the Court that the family member of CMS Employee #1 was never a legitimate employee of CMS. As mentioned in Mr. Schremenit's letter, she was placed on the company's payroll after her husband died of brain cancer. She never provided any services to CMS.

> …Steve took the helm as the patriarch of the Turner family after his father, my grandfather passed away. He made sure that his mother, all his siblings and their kids, my cousins, were safe and cared for. He has acted as Executor of my grandfather's estate, my grandmother's estate and the trust that cares for one of his nephews that suffers from Schizophrenia. He is the man that most of the members of our family go to for advice or help in all matters. He has been the stand-in father for some and shoulder to cry on for others.

(Letter from Drew Thiessen, attached as <u>Exhibit F</u>). Steve's cousin, Jeanne Warren, echoes many of the same sentiments:

> Steve is a much beloved and respected member of our family. Steve has always helped his family both personally and professionally. He has employed several family members, supported their businesses, provided care for his mother when she became widowed and also provided support for his two elderly aunts. Steve has always been generous and kind to his nieces, nephews and cousins. He is someone we can always count on for support and to be there when we need him.

(Letter from Jeanne Warren, attached as <u>Exhibit G</u>).

Other letters submitted on Mr. Turner's behalf tell similar stories. (*See* Letters Attached as <u>Exhibits H-K</u>). In sum, Mr. Turner is a good man who built a business that has supported both members of his family and of his community for nearly 40 years. It is clear that the instant conduct is an aberration in an otherwise commendable career.

### B. Other Traditional Sentencing Factors Also Support a Sentence of Probation.

Beyond Mr. Turner's good character, there are other circumstances surrounding the instant prosecution that warrant a sentence of probation. First, it is appropriate to consider the purposes of sentencing and how best those purposes can be achieved in light of the kinds of sentences available. 18 U.S.C. § 3553(a)(1) and (2). As noted above, Congress has identified four "purposes" of sentencing: punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(2). Mr. Turner understands and acknowledges that he has been convicted of a crime. Without

5

diminishing the seriousness of the charges, a sentence of probation would amply reflect the seriousness of the crime, respect for the law, just punishment, adequate deterrence, and protection of the public.

The first purpose encompasses three objectives: to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. Under the facts of this case, which are far from egregious compared to most federal felonies, probation would be adequate to accomplish all three. Mr. Turner did not commit a malicious or violent crime. Sentencing him to probation and imposing a reasonable fine would not be overly lenient, and it would not expose the community to any danger of recidivism.

The second and third purpose are related to deterrence and protecting the public from further crimes of the defendant. Mr. Turner has no criminal history. On top of that, tax and other white-collar offenders are considered low risk by the Bureau of Prisons and pose very little risk of reoffending.[2] There is no risk of recidivism in light of the lesson Mr. Turner has already learned, and the damage done to his reputation. Mr. Turner has been personally devastated as a result of this case. He has been embarrassed beyond measure in the community, and among his friends and customers. A prison sentence is not necessary to prevent him from committing further crimes.

The fourth purpose listed in 18 U.S.C. § 3553(a)(2), providing the defendant with educational and/or vocational training or other correctional rehabilitation, is inapplicable in Mr. Turner's case. As the record reflects, Mr. Turner fortunately has no such needs.

---

[2] Evan J. Davis, *Is the "First Step Act" Good News for Tax Crime and other White-Collar Defendants?* (Jan. 4, 2019), https://www.taxlitigator.com/is-the-first-step-act-good-news-for-tax-crime-and-other-white-collar-defendants-by-evan-j-davis/.

      C.      <u>There is No Need to Provide Restitution to TVA.</u>

Finally, it is also appropriate for the Court to consider the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a)(7). In the plea agreement, Mr. Turner agreed to a loss amount of $247,427.72 for purposes of sentencing, while reserving his right to argue as to the appropriate amount of restitution in this case. It is Mr. Turner's position that the agreed loss amount is overstated, and that restitution is not necessary. As a general rule, restitution covers the full extent of a victim's losses that are the proximate result of the defendant's criminal conduct. *See* 18 U.S.C. § 3663. The government bears the burden of establishing the existence and extent of the victim's losses. As stated in the plea agreement (R. 96, Page ID## 869-870), the parties have agreed that the only victim in this case, if restitution is ordered by the Court, is the Tennessee Valley Authority ("TVA").

In this case, the stipulated loss amount represents 650 tubes replaced by TVA in 2017. Those tubes were part of the 22,000 tubes replaced throughout TVA Paradise Unit 3 Hot Side. As courts have held, restitution for property damages must be limited to the extent authorized by 18 U.S.C § 3663(b): return of the property, or payment of the property's value, either on the date of damage or loss or on the date of sentencing, less the value of any part of the property that is returned. *See, e.g.*, *United States v. Abdelbary*, 746 F.3d 570, 577 (4th Cir. 2014). The evidence provided by the government shows that Paradise Unit 3 Hot Side was in a deplorable condition prior to any inspection performed by CMS. The government has repeatedly insisted that test holes made by CMS caused an accelerated corrosion of the air heater, but that is simply wrong. A comparison of photographs of the air heater shows that test holes made by CMS in 2015 were the same size in 2018 when a repair was done by a competitor. Thus, restitution in this case is not necessary as additional punishment. If, however, the Court decides to order Mr. Turner to pay

TVA any restitution, the amount should not be tied to the stipulated loss amount. Instead, the government should be required to offer proof of any loss amount it claims for purposes of restitution.

Moreover, Mr. Turner has not admitted to causing any of the alleged damage at TVA's Paradise Plant. Instead, the alleged harm was caused by the unauthorized actions of certain CMS employees. Mr. Turner's interpretation of 18 U.S.C. § 3663 is that restitution orders cover the victim's loss that are the direct and proximate result of the defendant's criminal conduct. *See United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009) ("The term 'victim' is defined as 'a person directly and proximately harmed by a defendant's offense.'") Here, TVA was not directly and proximately harmed by Mr. Turner's actions. Because TVA would have had to repair the tubes in Paradise Unit 3 Hot Side, without CMS employees unauthorized puncturing of small test holes in a few tubes, Mr. Turner was clearly not the direct and proximate cause of the alleged harm suffered by TVA. Although the parties agreed that the Court can include Defendant's total offense conduct in determining restitution, Mr. Turner argues that the Court should not consider conduct which he did not commit himself or authorize his employees to perform.

In sum, a restitution award in this case is not appropriate. If, however, the Court decides TVA should receive some amount of restitution, the order should be less than stipulated loss amount due to minimal, if any, harm caused to the deplorable condition of TVA Paradise Plant, which has since ceased operations for reasons wholly unrelated to the inspections caused by CMS.

  D. The Court Should Grant Probation Because of the Danger of Incarceration During this Unprecedented Global Pandemic.

The Court should also consider the danger a prison sentence would impose on Mr. Turner amidst the current global pandemic. It is no understatement to say that nothing in the lifetime of

8

Mr. Turner or anyone else involved in this this case has so affected the health, safety, economy, and behavior of this nation.

As of the date of this filing, the Centers for Disease Control reports over 45,235,796 cases of COVID-19, and over 731,931 Americans have died. (*See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#datatracker-home). Mr. Turner, himself, has already contracted COVID-19 on two occasions and he suffers from long-lasting effects, including brain fog, fatigue, and headaches. (PSR, ¶ 50). As the Court knows, the risk to inmates is serious; so serious, in fact, that the Attorney General issued a memorandum on March 26, 2020, to the Director of the Bureau of Prisons addressing "at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." AG Barr Memo to Bureau of Prison (March 26, 2020). Among the factors BOP is directed to consider in evaluating inmates for release to home confinement are: "The age and vulnerability of the inmate to COVID-19, in accordance with Centers for Disease Control and Prevention (CDC) guidelines." *Id*. Mr. Turner falls squarely into the group to be evaluated for release to home confinement -- he is non-violent, poses a minimal risk of recidivism, and his health make him vulnerable to COVID-19. In this unprecedented crisis, the Court should sentence Mr. Turner there from the start.

These considerations further support Mr. Turner's request for a sentence of probation. Section 3553(a) recognizes that the Court should consider any medical issues the defendant is facing and whether the sentence imposed will "provide the defendant…with needed medical care…in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). There is little doubt that Mr. Turner will receive better medical care outside of prison for his current medical needs. For all

9

these reasons, Mr. Turner's physical health, and the current pandemic weigh strongly in favor of a sentence in this case that does not include a period of traditional incarceration.

## Conclusion

Properly calculated, Mr. Turner has a total offense level of 12 and is a criminal history Category I. Based on these numbers, his guideline sentencing range is 10-16 months. As noted above, all applicable 3553(a) factors support a lenient sentence for Mr. Turner, in particular a sentence of probation. As for the history of Mr. Turner as a person, it is commendable. He has lived almost seven decades with no criminal history and worked hard to build a successful company. He has earned the respect and appreciation of those around him, including his employees. As for the future of Mr. Turner, he poses no danger to the community and no likelihood of re-offending. He has accepted responsibility for his actions and worked hard to repay society for the mistakes he made. Mr. Turner does not need to go to prison to understand the seriousness of his offense. Rather, the Court should impose a sentence of probation and impose a fine, as this sentence is sufficient, but not greater than necessary to achieve the aims of Section 3553(a).

Respectfully submitted,

/s/ *Kent Wicker*
Kent Wicker
William H. Brammell, Jr.
Kayla M. Campbell
DRESSMAN BENZINGER LAVELLE PSC
2100 Waterfront Plaza
321 West Main Street
Louisville, KY 40202
(502) 572-2500
*Counsel for Defendant Steve Turner*

## Certificate of Service

  I hereby certify that a copy of the foregoing has been served upon all parties by electronic filing this 22nd day of October, 2021.

               /s/ *Kent Wicker*
               Kent Wicker